EVARISTE BLANC, PLAINTIFF IN ERROR, *v.* GEORGE W. LAFAYETTE AND JOHN HAGAN.

In 1816 the register and receiver of a land  dce, acting under the authority of a law, reported as follows : " W₃ are of opn  n that all the claims included under the second species of the first class are already confirmed by the act of Congress of the 12th of April, 1814."

In 1820 Congress passed an act (3 Stat. at Large, 573) confirming all those claims which were recommended in the report for confirmation.

But where the commissioners erred in placing a claim in the second species of the first class, and erred in supposing that such a claim was already confirmed by the act of 1814, these errors prevent the act of 1820 from confirming the claim. It is consequently invalid.

THIS case was brought up from the Supreme Court of Louisiana, by a writ of error issued under the twenty-fifth section of the Judiciary Act.

By agreement of counsel in the State court, many original documents were used in the trial in the Supreme Court of Louisiana, which were left out of the record when it was transmitted to this court. It did not, therefore, furnish all the facts necessary for a complete statement of the case, which, however, have been taken from other authentic sources.

It was a conflict between a patent issued for some land near New Orleans to General Lafayette, in 1825, and a clam advanced by Blanc under an old Spanish alleged grant. If the latter was not good, the patent to Lafayette covered the land in dispute. Blanc claimed under Liotaud.

On the 23d of May, 1801, Louis Liotaud presented a petition to the Intendant Morales, praying that a tract of public land be granted to him, having six arpents front on the left bank of Canal Carondelet, with the ordinary depth, if there should be such a depth vacant, being bounded on the one side by the land of Carlos Guardiola, and on all the other sides by

public land.   He states as a reason which entitled him to the favorable notice of the Intendant, that his object was to establish a large garden and drain the land, which would be advantageous to the public, and contribute to the salubrity of the city.   And he bound himself to conform to the regulations relating to grants of land.

On this petition an order was made on February 11, 1802, which is attested by Carlos Ximenes, the notary, in these words : " Vistos : pasese este expediente al agrimensor gnl. Don Carlos Trudeau para que en vista de el informe lo conbeniente."   " Let this petition be referred to the Surveyor-General, Don Carlos Trudeau, in order that he may report his opinion thereon."

These appeared to be all the papers to support the claim. No survey was ever made, nor any report upon the petition.

On the 12th of April, 1814, Congress passed an act (1 Land Laws, 242) confirming certain claims in Louisiana.   The title of the act is, " An Act for the final adjustment of land titles in the State of Louisiana and Territory of Missouri."   By it certain claims were confirmed which had been presented to the register or recorder of land titles in the mode pointed out by a preceding law.   Liotaud had filed a claim in the land-office, stating in his application, " This land is claimed by virtue of proceedings had before the Spanish intendancy in 1801 and 1802, of which proceedings the accompanying document is a true copy, as taken from the original in the register's office for the eastern district of Louisiana."

On the 20th of November, 1816, the commissioners made their report, and noticed this claim as follows : —

" Louis Liotaud claims a tract of land situated in the county of Orleans, on the left bank of the Canal Carondelet, leading to the Bayou St. John, containing six arpents in front and forty in depth, and bounded on one side by lands granted by the Spanish government to Carlos Guardiola, and on the other side by vacant lands.   This tract of land is claimed by virtue of an order of survey dated in the year 1802."

The commissioners included this claim in the second species of the first class of claims, on which the board reported as follows : " We are of opinion that all the claims included under the second species of the first class are already confirmed by the act of Congress of the 12th of April, 1814.

On the 16th of January, 1817, the Commissioner of the General Land-Office transmitted this report to Congress, and on the 11th of May, 1820, Congress passed an act (3 Stat. at Large, 573), entitled " An Act supplementary to the several acts for the adjustment of land claims in the State of Louisiana."

The first section of this act was as follows: " That the claims for lands within the eastern district of the State of Louisiana, described by the register and receiver of the said district in their report to the Commissioner of the General Land-Office bearing date on the 20th of November, 1816, and recommended in the said report for confirmation, be, and the same are hereby, confirmed against any claim on the part of the United States."

So the matter stood until the year 1825, when, as has been already mentioned, a patent was issued to General Lafayette, which included the land claimed by Liotaud.

On the 1st of May, 1841, George Washington Lafayette, residing in France, and John Hagan, residing at New Orleans, brought a petitory action against Evariste Blanc, who claimed under Liotaud. The defendant alleged that he then was, and had been for more than a year before the commencement of the suit, in quiet possession of the land, and denied the plaintiffs' possession or right of possession. He also pleaded the prescription of twenty and thirty years.

In May, 1846, the cause came on for trial in the Parish Court in and for the parish and city of New Orleans, when there was a judgment for the defendant. The plaintiffs appealed to the Supreme Court of Louisiana, by which, in January, 1848, the judgment of the Parish Court was reversed; and to review this decision, upon the ground that his claim was confirmed by an act of Congress, Blanc sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Bullard,* for the plaintiff in error, and by *Mr. Janin,* in a printed argument, for the defendants in error.

*Mr. Bullard* stated the case, and then proceeded.

The only question, therefore, which this court is called upon to solve is, whether the claim of Louis Liotaud was confirmed by the act of the 11th of May, 1820, and to that act and the report of the register and receiver to which it relates, I proceed to invite the attention of the court.

The report of Harper and Lorrain was made in November, 1816, and was laid before Congress by the Secretary of the Treasury. It is to be found *in extenso* in the State Papers (Public Lands), Vol. III. pp. 254 *et seq.*

The claim of Liotaud, numbered 409, is classed by the register and receiver in the second species of the first class.

The act of the 11th of May, 1820, provides, that " all claims described in this report and recommended for confirmation are confirmed." See Laws, Instructions, and Opinions, 1st part, p. 330, Act of 11th May, 1820.

In determining what particular claims were confirmed by this act, the court ought, I think, to look at the whole report together, and if it appears that the register and receiver regarded them as valid claims under the various acts of Congress, in whatever form of words that opinion was expressed, a liberal construction should be given to the act. It is true the register and receiver say in relation to the claims classed with this, that in their opinion they are already confirmed by a previous act of Congress in 1814. In this they were perhaps mistaken; but surely it is a strong form of expression of an opinion that they ought to be confirmed. The court below gave a very narrow and illiberal construction to the act, and, seizing upon this expression, declared that it was a mistake, and that the act did not confirm this claim. If they had looked further into the report they would have found that the commissioners make favorable mention of this claim, although they say they may have been mistaken in supposing that it had already been confirmed. The truth is, as it appears to me, all the claims thus classed, all that were not rejected by the register and receiver, were, according to a just and liberal construction of the act, treated as valid claims under the treaty, and confirmed by the act of 1820. They have always been so treated and regarded by the Land Department of the government, and this very claim is laid down on the public surveys of the township in which it is situated.

If, then, in 1820, the government relinquished its title to the land in controversy in favor of a claimant under an inchoate Spanish grant, it seems quite clear that the same land could not validly be patented to General Lafayette in 1825, as a donation, or in remuneration for eminent public services. It no longer belonged to the domain. It is true no patent ever issued to the confirmee, but the act of 1820 does not provide for patents in such cases, and I presume this court will hold that the act itself is a legislative grant of land with specific boundaries, and that the act of Congress, together with a location and survey approved by the Surveyor-General, is equivalent to a patent. Such is the view taken of it by the Department of the Interior. I admit the general rule to be, that the legal title is still in the domain until a patent issues, but that rule only applies to cases in which, by law, a patent is required for the perfection of the title of the confirmee or purchaser, or other grantee.

The court of Louisiana further erred in looking behind the confirmation, and deciding that the primitive inchoate title was not valid according to the laws and usages of the government of Spain. They cite some old cases from the Louisiana Re-

Blanc *v.* Lafayette et al.

ports to that effect, but those were cases in which neither party had a legal title; both held under commissioners' certificates, and had only equitable titles, and the court decided upon the comparative value of the primitive titles. When the register and receiver have recommended an ancient Spanish title for confirmation, and it has accordingly been confirmed by an act of Congress, I conceive that it is conclusive and cannot be opened. But even if the court had a right to look behind the confirmation, it was in error in supposing that the imperfect title of Liotaud was not valid under the Spanish law. In 1798, the Governor-General was deprived by a royal *cedula* of the right of granting lands, and that authority was vested in the intendancy. The forms of proceeding in the tribunal of the intendant, with a view of obtaining a grant of land, are familiar to this court. The person who desired to obtain a concession of land presented his petition (*requête*) to the intendant. The intendant, through the medium of a notary, made a written order referring it to the surveyor-general, in order to ascertain whether the land was vacant. In the particular case now before the court this was done. It does not appear that the surveyor-general made any particular report, but it does appear that he noted on a general plot of land near New Orleans, made by order of the government, the tract of land solicited by Liotaud. Here all further proceedings were arrested by the change of government in 1803. The papers were filed in the office of the intendant, and marked with others "*instancias pendientes*," or proceedings yet pending. The order, or *auto*, of the intendant must be regarded as a *primero decreto*, and equivalent to a warrant or order of survey under the preceding forms of proceeding while the governor had the power to grant lands; although the land thus solicited did not become the property, strictly speaking, of the petitioner, yet under numerous decisions of this court I submit whether it did not confer such a right as was protected by the treaty of cession. Be that, however, as it may, the question now is, whether the claim founded on such a commencement of title has been recommended by the commissioners for confirmation, and confirmed by act of Congress; if so, it clearly amounts to a relinquishment of title on the part of the United States from the date of the act of Congress, and in 1825, the date of Lafayette's patent, must be regarded as a rightful claim, and not embraced in the grant to Lafayette by his patent.

*Mr. Janin*, for the defendants in error, made the following points:—

1st. There never was a grant or order of survey, or even a permission of settlement, in favor of Liotaud. There was a petition and an order to Trudeau to give his opinion on it, and that is all. The petition was of the 23d of May, 1801, the order was not made on it until the 11th of February, 1802. And we have a plan introduced by the defendant, dated the 1st of March, 1802, purporting to be a plan of the concessions in the neighborhood of New Orleans, executed by Trudeau by order of Morales. On this the land claimed by the defendant is designated as "*Terreno solicitado per Don Louis Lioto (Liotaud).*" Trudeau, therefore, knew of this claim, and if he did not report on it, it was not unintentionally. Possibly he knew that it conflicted with the claims of Castillon and Griffon (see Turner's survey of 1825), possibly he thought that the land ought to be reserved for the commons of the city; but whatever might be his reason, certain it is that he did not report on it, still less survey it. Adjoining this is another tract, marked on that plan "*Terreno solicitado per Don Gilberto Guillemard.*" That tract was no doubt claimed and petitioned for in the same manner and form as Liotaud's. And yet it is included in the undisputed portion of General Lafayette's grant. Very probably the petition was, and perhaps still is, in the same bundle of "*instancias pendientes*" in which Liotaud's petition was found. And as Liotaud's petition was No. 107, fol. 61 (see Lawson's certificate) of the "*instancias pendientes,*" we have the assurance that there are at least 106 other such claims which have the same merit as Liotaud's. But he was the only one to claim a confirmation on an abandoned, neglected, or rejected petition. And he did not (see his notice) pretend that he had an order of survey. His claim was based on "proceedings." It is thus he qualified his petition and the order of reference. But no Spanish law or act of Congress is extant recognizing a claim to land merely because it was asked for.

2d. This claim has never been confirmed. This case is identical with that of Orillon *v.* Slack, 11 La. Rep. 591. Reboul and Franchebois's claims, discussed in that case, are embraced in the same report as Liotaud's, and separated from it by only three claims. 3 Public Lands, 255, 256. The court held that the report of the register and receiver of November 20, 1816, that these claims were already confirmed by the act of April 12, 1814, was not a recommendation that they should be confirmed, and as the act of May 11, 1820, confirmed only such claims as were embraced in the report and recommended for confirmation, it did not confirm the claims in question. The register and receiver did not recommend

them for confirmation, because in their opinion they were already confirmed. Whether they were right or wrong in this opinion, they certainly did not recommend them. They left them where they were. On such claims as were confirmed by the act of April 12, 1814, they were not to make a report recommending them for a second confirmation, nor did they do so; but they were authorized, by the third section of that act, to issue at once certificates of confirmation, which the Commissioner of the General Land-Office was to examine, and which were to be followed by patents. The opinion expressed in the report of November 20, 1816, on these claims, is a disclaimer of jurisdiction, and no more. That opinion has never been taken into consideration or sanctioned by Congress; it is therefore of no weight with the court, who must examine for themselves whether indeed the act of April 12, 1814, did confirm Liotaud's claim. And by examining that act it will appear beyond argument that the opinion of the register and receiver was erroneous.

The confirmatory provisions of that act are contained in the first and second sections. They confirmed only claims which were embraced in previous reports of commissioners, or registers and receivers, and which were based on incomplete French or Spanish grants or concessions, or warrants or orders of survey, which had been filed in the proper offices, and when it appeared by the report of the commissioners, or registers and receivers, that the concession, warrant, or order of survey contained a special location, or had been actually located or surveyed before the 20th of December, 1803. None of the various kinds of claims confirmed by that act resembles Liotaud's.

3d. General Lafayette's patent was issued in strict compliance with the acts of Congress relating to this subject. He was first to locate the land, then have it surveyed, and on the presentation of the survey, together with the certificate of the register, stating that the land is not rightfully claimed by any other person, the patent was to issue. On the survey in evidence in this claim, the land involved in this suit is represented as vacant.

But the defendant contends that the register was mistaken, that the certificate should have shown that this land " was rightfully claimed by Liotaud," and that his rights could not be defeated by the register's error.

It is more than probable that the register, when he gave that certificate, discovered that his error was in having expressed, in 1816, the opinion that Liotaud's claim was already confirmed. And having discovered this error, it was his duty to state that this land was vacant.

4th. If it was true that Liotaud's claim was confirmed by the act of May 11, 1820, and had it been patented, it would yet have to give way to General Lafayette's patent. Liotaud could only obtain a confirmation and a patent in defiance of law. "If the patent has been fraudulently obtained, or issued against law, it is void." Stoddard et al. *v.* Chambers, 2 Howard, 318. If a confirmation has been fraudulently obtained, no certificate of survey will be issued, and the patent will be withheld. Opinion of Attorney-General Wirt, of November 25, 1824, Collection of Laws, Opinions, and Instructions relating to the Public Lands, Vol. II. p. 24. Opinion of Attorney-General B. F. Butler, of July 31, 1839, Ibid. p. 1040. Such a confirmation, such a patent as are here hypothetically assumed to have taken place, could only be the result of fraud. It was a fraud on Liotaud's part to present his petition as giving him a claim to land, and to rely upon the register and receiver's ignorance of the Spanish language. If those officers had recommended such a claim for confirmation, it would also on their part have been either fraud, or such gross negligence as the law assimilates to fraud. Intending not to act on this claim or recommend it for confirmation, they examined it perhaps very hastily, and allowed themselves the more easily to be misled by Liotaud's misrepresentations.

5th. Had Liotaud's claim been confirmed, either by the act of April 12, 1814, or by that of May 11, 1820, it would yet not have severed the land from the domain, for the claim is indefinite and its location uncertain, it never was surveyed, and no plan was filed with it when the confirmation was claimed. It was a claim for six arpents front on the left bank of Canal Carondelet, with the ordinary depth, if that depth could be found, bounded on one side by the land of Carlos Guardiola, and on all the other sides by public land. "Until a concession is located, it can give no claim to any specific tract of land." Bissell *v.* Penrose, 8 Howard, 341.

The description in the claim would permit its location on one side of Guardiola's land as well as on the other. Guardiola owned two arpents front on Canal Carondelet, running back between parallel lines to Gravier's plantation; this strip of land is nearly parallel to the real line of the city of New Orleans, and half a mile distant from it. If Liotaud's claim was located on the city side of Guardiola's land, it would conflict with General Lafayette's 114 acres; if located on the other side, no conflict would exist between those parties. The direction of the said lines and the extent of the claim are equally uncertain. Nor is the obscurity of the claim removed by possession, for Liotaud never exercised any act of possession, and

the plaintiff in error was the first to attempt equivocal acts of possession, the land being all swamp.

This case falls under the principles discussed in Bissell v. Penrose, 8 Howard, 332. There a New Madrid patent was declared void, because it had been located upon land duly claimed under a Spanish concession, and therefore withheld from sale. And it was admitted that, if the Spanish concession had not been located by a survey, the patent would have prevailed; in other words, the land would have been considered as public property not detached from the domain. Whether the act of Congress, by which a claim is confirmed, requires the issuing of a patent or not, a definite designation by a survey is equally necessary to separate the land from the domain and deprive the United States of the right of disposing of it. Such has also always been the doctrine of the Supreme Court of Louisiana. In the present case that court said (3 Annual Reports, 61): "This location, unsupported by any survey, or by actual possession, before the change of government, would be too indefinite and uncertain to prejudice the plaintiffs in error [here the defendants]. We take the rule to be, that, in order that the confirmation may have the force and effect of a patent, the description in the inchoate title, or in the act of Congress, must be such as will identify the land. If it will fit another place better, or equally well, it is defective, and will not protect the holder who can show no original possession against a subsequent location, made under the authority of Congress." See also Lefebvre v. Comau, 11 La. Rep. 321.

Mr. Justice WAYNE delivered the opinion of the court.

The plaintiff in error having claimed the land in dispute under an act of Congress, and the construction of that act by the Supreme Court of Louisiana having been against the claim, the case is brought here under the twenty-fifth section of the judiciary act of 1789, to have the opinion given in that court reviewed by this tribunal.

The question presented is, whether or not the claim of Louis Liotaud for a tract of land situated in the Eastern District of Louisiana was confirmed by the act of Congress of the 11th of May, 1820 (3 Stat. at Large, 573), against any claim to the land by the United States, so that an entry could not be made upon it in favor of Major-General Lafayette.

The plaintiff in error claims under Liotaud. That claim will be found in 3 American State Papers, Public Lands, 224.

It is, "that Louis Liotaud claims a tract of land, situated in the county of Orleans, on the left bank of the Canal Carondelet, leading to the Bayou St. John, containing six arpents in

front, and forty in depth, and bounded on one side by lands granted by the Spanish government to Carlos Guardiola, and on the other side by vacant lands.   This tract of land is claimed by virtue of an order of survey dated in the year 1802." This memorandum is found in the report of the commissioners for ascertaining and adjusting claims to land in the eastern district of the State of Louisiana.   It was transmitted to Congress on the 16th of January, 1817, by Josiah Meigs, the General Land Commissioner.   3 American State Papers, Public Lands, 222.

The claims were divided into three general classes : —

1.  Such as stand confirmed by law.

2.  Those which the register and receiver thought ought to be confirmed.

3.  Such claims as in their opinion could not be confirmed under existing laws.

The first class comprehended three species of claims : —
1.  Such as were founded on complete titles, granted by the French or Spanish governments.   2. Claims resting upon incomplete French or Spanish grants or concessions, warrants, or orders of survey, granted prior to the 20th of December, 1803. 3.  Claims rejected by a former board of commissioners, merely because the lands claimed were not inhabited on the 20th of December, 1803.

Liotaud's claim is put by the register and receiver in the second species.  3 American State Papers, Public Lands, 224.

This report was acted upon by Congress.   It declared that " the claims for lands within the eastern district of the State of Louisiana, described by the register and receiver of the said district, in their report to the Commissioner of the General Land-Office, bearing date the 20th of November, 1816, and recommended in the said report for confirmation, be, and the same are hereby, confirmed against any claim on the part of the United States."   Act of May 11, 1820, ch. 87, § 1 (3 Stat. at Large, 573).

The register and receiver had said in their report, that all the claims included under the second species of the first class were already confirmed by the act of Congress of the 12th of April, 1814.   In this they were certainly mistaken, as they were also in placing Liotaud's claim in what was termed in their report the second species of the first class of claims.

The record does not contain a copy of the order of survey in favor of Liotaud, mentioned by the register and receiver, dated as they say in the year 1802.   Nor is there in it either of those documentary papers, uniformly given by the intendants-general of Spain when grants of land were made.   We have not

10*

before us either a grant or order of survey in favor of Liotaud. Nothing to make the claim an inchoate right, upon which a title could be enlarged, in favor of Liotaud. Indeed, we do not know any thing from the record about it, and all that we do know of the claim is the memorandum of the register and receiver already recited. That discloses that the order of survey mentioned had been given after the cession of Louisiana by his Majesty to the republic of France. Register Harper and Receiver Lawrence say in their report that Liotaud's claim is founded on an order of survey dated in the year 1802. Apart from the consideration that the order for a survey is dated after the time when Spain had parted with her political sovereignty to grant land in Louisiana, there is no proof of any thing having been subsequently done by Liotaud, or by any official of Spain, to give to Liotaud even an inchoate equity to the land. The claim, then, could not be rightfully, nor was it understandingly, put by the register and receiver under the second species of the first class of claims of incomplete French or Spanish grants or concessions, warrants, or orders of survey granted prior to the 20th of December, 1803.

Liotaud's claim, having been mistakenly put where we find it, it is neither within the letter nor the intention of the act of the 11th of May, 1820, confirming titles to land described by the register and receiver. Congress meant to confirm claims to land under some documentary right from France or Spain, and not claims by persons without any such proof. Liotaud's claim, then, under which the plaintiff in error asserts his right, does not interfere with the patent for the same land issued by the United States in favor of Major-General Lafayette. It is admitted in the case, that the defendants in error have acquired the rights of General Lafayette to the lands in dispute. All of us think that there was no error in the judgment of the Supreme Court of Louisiana, and its judgment is affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.