# MICHIGAN LAND AND LUMBER COMPANY *v.* RUST.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 57. Argued October 25, 26, 1897. — Decided December 18, 1897.

The act of September 28, 1850, c. 84, granting swamp lands to the several States, was a grant *in præsenti*, passing title to all lands which at that date were swamp lands, but leaving to the Secretary of the Interior to determine and identify what lands were, and what lands were not, swamp lands.

Whenever the granting act specifically provides for the issue of a patent, the legal title remains in the Government until its issue, with power to inquire into the extent and validity of rights claimed against the Government.

Although a survey had been made of the lands in controversy which indicated that they were swamp lands, it was within the power of the land office at any time prior to the issue of a patent to order a resurvey and to correct mistakes made in the prior survey.

The facts in this case clearly show an adjustment of the grant upon the basis of the resurveys, and their acceptance by the officer of the State charged by the act of Congress with the duty of so doing, and this makes such adjustment final and conclusive.

The act of March 3, 1857, c. 117, did not operate to confirm to the State of Michigan the title to all lands marked on the approved and certified list of January 13, 1854, as swamp and overflowed lands, and direct the issue of a patent or patents therefor, but it simply operated to accept the field notes finally approved as evidence of the lands passing under the grant, leaving to the land department to make any needed corrections in the surveys and field notes.

The decision in *Martin v. Marks*, 97 U. S. 345, does not conflict with this construction of the act of 1857.

THIS was an action of ejectment commenced in the Circuit Court of the United States for the Eastern District of Michigan on February 11, 1888. On November 28, 1892, the case came on for trial before the court and a jury. At the close of the testimony the jury, under the instructions of the court, returned a verdict for the defendants. On May 7, 1895, this judgment was affirmed by the Court of Appeals, 31 U. S. App. 731, and to review such judgment the case was brought

here on writ of error. The land in dispute is situated in Clare County, being the S. E. ¼ of S. E. ¼ of sec. 20 ; N. W. ¼ of S. W. ¼ of sec. 21 ; N. W. ¼ of S. E. ¼ of sec. 22; N. W. ¼ of N. W. ¼ of sec. 28; N. ½ of S. W. ¼ of sec. 29; N. ½ of N. E. ¼ of sec. 35, township 18, range 3 W.; and E. ½ of S. W. ¼ of sec. 1, township 18, range 4 W., and amounting to 400 acres, the undivided half of which only was claimed by plaintiff.

The contention of the plaintiff, generally speaking, is that this was swamp land, and granted to the State of Michigan by the act of Congress of date September 28, 1850, c. 84, 9 Stat. 519, granting swamp lands to the several States; that it was included in a list of such lands in the Ionia land district, approved by the Secretary of the Interior and forwarded to the governor of Michigan on January 13, 1854 ; that the act of March 3, 1857, c. 117, 11 Stat. 251, confirmed the action of the Secretary of the Interior, and thereby passed the title to the State of Michigan, by which State it was, on October 14, 1887, conveyed to plaintiff's grantor.

The defendants, on the other hand, contend that the original surveys of the public lands in the State of Michigan were erroneous; that, at the instance of the State, Congress ordered resurveys, which resurveys were carried on from the years 1842 to 1857; that, while it is true this land was by the original surveys classed as swamp land and included in the Ionia land district list approved and certified to the State of Michigan, the resurveys showed that it was not land of that description; that a new list for that district, not including this land, was in 1866 made out and certified to the State ; that such new list was accepted by the State as correct, and a patent for the lands described therein issued to and received by it; that after all this had taken place and in 1870 the land in question was sold by the officers of the United States at auction after public advertisement and that patents were duly issued upon such sale, under which patents the defendants claim title.

*Mr. Frank S. Robson* and *Mr. A. B. Browne* for plaintiff

in error. *Mr. J. W. Champlin* and *Mr. A. J. Britton* were on their briefs.

*Mr. Benton Hanchett* and *Mr. Ashley Pond* for defendants in error.

Mr. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

This case involves questions of the power of the land department over the matter of the identification of the particular lands passing under the swamp land act of 1850, of the finality of the action of the Secretary of the Interior in approving and certifying to the Governor of the State a list of such lands, and of the effect of the confirmatory act of 1857. There is no testimony showing what was in fact the condition of the land, whether swamp or not, at the time of the passage of the act of 1850, and the case turns wholly upon the documentary evidence.

The act of 1850 made a grant *in præsenti;* in other words, the title then passed to all lands which at that date were swamp lands, and the only matters thereafter to be considered were those of identification. *Railroad Company* v. *Smith,* 9 Wall. 95; *French* v. *Fyan,* 93 U. S. 169; *Martin* v. *Marks,* 97 U. S. 345; *Rice* v. *Sioux City & St. Paul Railroad,* 110 U. S. 695; *Wright* v. *Roseberry,* 121 U. S. 488; *Tubbs* v. *Wilhoit,* 138 U. S. 134. But while the act operated as a grant *in præsenti,* the determination of what lands were swamp lands was entrusted to the Secretary of the Interior. Section 2 contains this provision :

" That it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the State of Arkansas, and, at the request of said governor, cause a patent to be issued to the State therefor; and on that patent, the fee simple to said lands shall vest in said State of Arkansas, subject to the disposal of the legislature thereof."

It may be remarked in passing that while the first and second sections refer specifically to the State of Arkansas, section 4 of the act makes it applicable to all the States. It is true that in the first section Congress defines the lands granted as " swamp and overflowed lands, made unfit thereby for cultivation ; " and section 3, referring to the lists and plats ordered by section 2 to be made out by the Secretary of the Interior, contains this further specification as to the character of the lands granted:

" That in making out a list and plats of the lands aforesaid, all legal subdivisions, the greater part of which is ' wet and unfit for cultivation,' shall be included in said list and plats ; but when the greater part of a subdivision is not of that char-acter, the whole of it shall be excluded therefrom."

But while Congress thus defined what it intended to grant as swamp and overflowed lands it entrusted, as appears from section 2, the identification of those lands to the Secretary of the Interior.

It will be perceived that the act contemplated the issue of a patent as the means of transferring the legal title. In *Rogers Locomotive Works* v. *American Emigrant Co.*, 164 U. S. 559, 574, it was said, speaking in reference to this matter, and after a full review of the previous authorities : " When he " (that is, the Secretary of the Interior) " made such identification, then, and not before, the State was entitled to a patent, and ' on such patent ' the fee simple title vested in the State. The State's title was at the outset an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued." .

Generally speaking, while the legal title remains in the United States, the grant is in process of administration and the land is subject to the jurisdiction of the land department of the Government. It is true a patent is not always neces-sary for the transfer of the legal title. Sometimes an act of Congress will pass the fee. *Strother* v. *Lucas*, 12 Pet. 410, 454; *Grignon's Lessee* v. *Astor*, 2 How. 319 ; *Chouteau* v. *Eckhart*, 2 How. 344, 372 ; *Glasgow* v. *Hortiz*, 1 Black, 595 ; *Langdeau* v. *Hanes*, 21 Wall. 521 ; *Ryan* v. *Carter*, 93 U. S.

78. Sometimes a certification of a list of lands to the grantee is declared to be operative to transfer such title, Rev. Stat. § 2449; *Frasher* v. *O'Connor*, 115 U. S. 102; but wherever the granting act specifically provides for the issue of a patent, then the rule is that the legal title remains in the Government until the issue of the patent, *Bagnell* v. *Broderick*, 13 Pet. 436, 450; and while so remaining the grant is in process of administration, and the jurisdiction of the land department is not lost.

It is, of course, not pretended that when an equitable title has passed the land department has power to arbitrarily destroy that equitable title. It has jurisdiction, however, after proper notice to the party claiming such equitable title, and upon a hearing, to determine the question whether or not such title has passed. *Cornelius* v. *Kessel*, 128 U. S. 456; *Orchard* v. *Alexander*, 157 U. S. 372, 383; *Parsons* v. *Venzke*, 164 U. S. 89. In other words, the power of the department to inquire into the extent and validity of the rights claimed against the Government does not cease until the legal title has passed. "A warrant and survey authorize the proprietor of them to demand the legal title, but do not, in themselves, constitute a legal title. Until the consummation of the title by a grant, the person who acquires an equity holds a right subject to examination." *Miller* v. *Kerr*, 7 Wheat. 1, 6. After the issue of the patent the matter becomes subject to inquiry only in the courts and by judicial proceedings. *United States* v. *Stone*, 2 Wall. 525, 535; *Moore* v. *Robbins*, 96 U. S. 530; *United States* v. *Schurz*, 102 U. S. 378, 396; *Bicknell* v. *Comstock*, 113 U. S. 149, 151; *Iron Silver Mining Co.* v. *Campbell*, 135 U. S. 286; *Williams* v. *United States*, 138 U. S. 514. This jurisdiction of the department has been maintained in cases of preëmption where the entire purchase money has been paid and a receiver's final certificate issued. *Orchard* v. *Alexander*, 157 U. S. 372, and cases cited in the opinion; *Parsons* v. *Venzke*, 164 U. S. 89.

In *Knight* v. *United States Land Association*, 142 U. S. 161, is a full discussion by Mr. Justice Lamar of the power of the Secretary of the Interior over proceedings in respect to the

disposition of public lands; and on page 178 it is said, as illustrative of the scope of that power: "For example, if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly ascertained fact the patent, if issued, would have to. be annulled, and that it would be his duty to ask the Attorney General to institute proceedings for its annulment, it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the Attorney General to take measures to annul." And, .again, on page 181 is this language: "The Secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it. He represents the Government, which is a party in interest in every case involving the surveying and disposal of the public lands." See also *Orchard* v. *Alexander,* 157 U. S. 372, 381, 382; *Warner Valley Stock Company* v. *Smith,* 165 U. S. 28, 34. This jurisdiction extends to the ordering of new surveys whenever in the judgment of the department there has been error or fraud in those already made. *Cragin* v. *Powell,* 128 U. S. 691. In *Tubbs* v. *Wilhoit,* 138 U. S. 134, 143, the court. quoted with approval this passage from a letter of the Secretary of the Interior: " There can be no doubt but that under the act of July 4, 1836, reorganizing the general land office, the Commissioner has general supervision over all surveys, and that authority is exercised whenever error or fraud is alleged on the part of the surveyor general." And in *New Orleans* v. *Paine,* 147 U. S. 261, the question was presented as to the power of the department to order a new survey, and on page 266 the rule was thus stated: " If the department was not satisfied with this survey, there was no rule of law standing in the way of its ordering another. Until the matter is closed by final action, the proceedings of an officer of a department are as much open to review or reversal by himself,

or his successor, as are the interlocutory decrees of a court open to review upon the final hearing." So, notwithstanding that a survey had been made and that such survey indicated that the land in controversy was swamp land, and, therefore, passing under the act of 1850 to the State of Michigan, it was within the power of the land department, at any time prior to the issue of a patent, of its own motion, to order a resurvey, and correct by that any mistakes in the prior survey.

But in this case it is not necessary to rely alone on the general power vested in the land department, for as early as 1842 the attention of the legislature of Michigan was called to the fact that there had been errors in the surveys of public lands within the State, and a resolution was passed by it in these words :

"Whereas, it has been satisfactorily made to appear to this legislature that large districts of lands lying within the limits of the State of Michigan have been returned by some of the deputy United States surveyors to the general land office as surveyed, where no surveys whatever have been made, or where the surveys have been so imperfectly done as to be utterly valueless; and whereas, the United States surveyor general of this land district has caused the lands so represented as surveyed to be offered for sale, to the very great injury of the State of Michigan and the citizens thereof ; therefore,

" *Be it resolved by the Senate and House of Representatives of the State of Michigan*, That the President of the United States be requested to cause the subdivisions of the following townships of land, situate within the State of Michigan, and which have been represented to have been surveyed, but which have either not been surveyed or have been so imperfectly surveyed that said work is valueless, to be surveyed at as early a day as may be consistent, viz. :

&ast;  &ast;  &ast;  &ast;  &ast;

" *Resolved*, That the governor be requested to transmit the foregoing preamble and resolution to the President of the United States." Laws Mich. 1842, No. 8.

A letter, enclosing a copy of this resolution, was forwarded to the Commissioner of the General Land Office, and by him

referred to the President, who endorsed it as follows: "Let the matter be referred to the surveyor general, with instructions as indicated, and let the Governor of Michigan be informed of the measures to be adopted." Thereupon proceedings for new surveys were taken by the land department, of which fact the Governor of the State was duly informed. It is true that in the resolutions of the Michigan legislature 81 townships were specifically named, and that the land in controversy was not included within those townships, but it appears that on the strength of the information thus furnished the land department proceeded to make new surveys of other lands than those specifically mentioned by the legislature, and the attention of Congress having been called to the matter, it from 1845 to 1856 inclusive made appropriations for correcting surveys in the State of Michigan. Act of March 3, 1845, c. 71, 5 Stat. 752, 762; Act of August 10, 1846, c. 175, 9 Stat. 85, 95; Act of March 3, 1849, c. 100, 9 Stat. 354, 365; Act of September 30, 1850, c. 90, 9 Stat. 523, 530; Act of March 3, 1851, c. 32, 9 Stat. 598, 611, 612; Act of March 3, 1853, c. 97, 10 Stat. 189, 204; Act of August 4, 1854, c. 242, 10 Stat. 546, 565; Act of March 3, 1855, c. 175, 10 Stat. 643, 660; Act of August 18, 1856, c. 129, 11 Stat. 81, 86. The last three appropriations were made after the sending of the approved list for the Ionia land district to the Governor on January 13, 1854.

It may be noticed here, in passing, that in the adjustment of the swamp land grant for the State of Michigan the land department did not include in one list all the swamp lands within the State, but made out several lists, apparently one at least for each land district.

Not only was there general knowledge on the part of the authorities of the State, as of those at Washington, of the existence of errors and mistakes in the original surveys of public lands in the State of Michigan, but also was there particular information as to supposed errors in the surveys of the land in controversy. After the passage of the act of 1850 the Commissioner of the general land office instructed the surveyor general of the State of Michigan to examine the

field notes of the surveys on file in his office and report therefrom a list of the lands which were swamp or overflowed. From time to time the surveyor general forwarded to the land department lists in accordance with these instructions. On March 29, 1852, he forwarded a list containing the land in question, and in the letter accompanying is found this language : "The districts reported by Judge Burt and Hiram Burnham to be fraudulent are embraced in this list and marked 'F'," and in that list the district containing the land in controversy is marked with the letter "F," so that upon the records of the general land office was to be found information that the survey of this particular land was reported to be erroneous, and as such was likely to be included in resurveys then pending. The report of the commissioner of the state land office to the legislature of the State, for the year ending November 30, 1856, contains this statement : "Patents are now received for all these lands in the State except those situate in the Ionia land district, comprising about 1,200,000 acres, and for these we are assured the patents will soon be forwarded, the making of which have been delayed in consequence of extensive resurveys by the General Government, which, in some instances, changes the amount and character of the land." And again, after speaking of the application for the purchase of particular tracts, he says they have been denied, because "no valid sale could be, made until after a compliance with the law requiring advertisement of a public offering to be published in each county of the State ; and such public sale or offering has not been deemed advisable until after the title of the State to the grant should be wholly confirmed by the issue of the patents, and the numerous corrections and restatements of the lists necessary to be previously made by the department at Washington." And still again: "It is well known that many tracts, and sometimes almost entire sections, are now considered as among the best of farming lands, or extensively covered with pine and other valuable timber."

Upon the resurveys the land in controversy was shown not to be swamp and overflowed land, and lists conforming to these new surveys were duly approved and certified by the

Secretary of the Interior and forwarded to the Governor of the State of Michigan; the receipt of such lists was acknowledged and a request made for patents for the lands described therein, and patents were issued and accepted conveying such lands.

These facts indicate very clearly an adjustment of the grant upon the basis of the resurveys. Undoubtedly the beneficiary of such a grant is interested in its adjustment and may properly be heard before the officers of the grantor in determining what lands are embraced within it, and any assent by the grantee to a determination made by the officers of the grantor as to the lands passing within the grant would be binding upon it. In this case the grant was for the benefit of the State of Michigan, but in the act of 1850 making the grant, Congress, as it had a right to do, clearly indicated the officer of the State, to wit, the Governor, whose action in the premises should be the action of the grantee. Under these circumstances, it being known that there were errors in the surveys, and the legislature of the State having requested action to be taken to correct these errors, and resurveys having been undertaken, and while they were being prosecuted for the purpose of correcting such errors, a list of lands, which by the original surveys appeared to be swamp and overflowed, was made out and forwarded to the Governor. Upon the records of the land department the original survey of the district containing the land in controversy was at that time challenged as fraudulent. After the list containing this land had been forwarded to the Governor and his request for a patent returned to the land department, a patent was issued not including this land. Subsequently the resurveys were finished and according to them this land was excluded from the grant. Thereupon a new and corrected list containing the lands, which by the resurveys were shown to be swamp and overflowed, was made out, approved by the Secretary of the Interior and forwarded to the Governor. Upon its receipt the Governor requested patents to be issued, and patents were issued conveying the lands specified therein. This clearly shows an acceptance by the officer of the State, charged under the act of Congress with the duty of so doing, of the resurveys as within the

authority of the land department, and makes the adjustment of the grant upon the basis of such resurveys final and conclusive. The act of the State in accepting the new and corrected survey as the basis of adjustment is tantamount to a waiver of any claims under the prior and erroneous survey, for it cannot be that a grantee accepting a patent for lands which according to a final and correct survey are shown to be within the terms of the grant can thereafter be heard to say, Notwithstanding I have taken all the lands shown to belong to me by this correct survey, I also claim lands which by a prior and erroneous, if not fraudulent survey, appeared to pass under the grant. He cannot in that way enlarge the scope of the grant, and after taking lands which are finally determined to pass under the grant say, I also insist upon lands which upon such final survey are shown not to be within the grant, simply because under a prior erroneous survey they appeared to be within its terms.

We come now to consider the effect of the act of March 3, 1857, c. 117, 11 Stat. 251, which provided:

" That the selection of swamp and overflowed lands granted to the several States by the act of Congress . . . heretofore made and reported to the commissioner of the general land office, so far as the same shall remain vacant and unappropriated, and not interfered with by an actual settlement under any existing law of the United States, be and the same are hereby confirmed, and shall be approved and patented to the said several States, in conformity with the provisions of the act aforesaid, as soon as may be practicable after the passage of this law: *Provided, however,* That nothing in this act contained shall interfere with the provisions of the act of Congress entitled ' An act for the relief of purchasers and locators of swamp and overflowed lands,' approved March the second, eighteen hundred and fifty-five, which shall be and is hereby continued in force, and extended to all entries and locations of lands claimed as swamp lands made since its passage."

It is contended by the plaintiff that the purpose and effect of this act were to confirm to the State of Michigan the title to all lands marked on the approved and certified list of Jan-

uary 13, 1854, as swamp and overflowed lands, and to direct the issue of a patent or patents therefor.   Whatever question might have existed, were it not for this act, as to whether any of the lands marked on such lists were swamp and overflowed lands, and whatever authority there might otherwise be in the land department to make corrections, Congress, which had full power over the matter, by it in terms granted to the State these lands ; such action by Congress was a finality ; thereafter no inquiry could be made as to the character of the lands ; no correction of the list ; and the full equitable title passed to the State, beyond the possibility of challenge.   It is insisted that Congress must have known of the alleged irregularities in the surveys ; known of the approval by the Secretary of the Interior of this list ; that it had been forwarded to the Governor ; that the Governor had accepted and requested the issue of patents ; and with this knowledge passed this act, intending thereby to remove all question as to the character of the lands, to put an end to the necessity for any further examination, and to make this list the single and absolute evidence of the lands it was granting to the State of Michigan.   There would be force in this contention if the act of 1850 contained simply a grant to the State of Michigan, and there were but a single list of swamp lands in that State. It might then well be said that this act was passed with reference solely to the conditions existing in respect to this attempted selection of swamp and overflowed lands in that State, but the act of 1850 was a grant to all the States, and the act of 1857 must, therefore, be construed as applicable to the conditions existing in all of the States.   It is contended by the defendants that it applies only to those States in which the state authorities had attempted to make selections of swamp and overflowed lands within their limits, and had communicated such selections to the land department, and that its purpose was simply to confirm to the States lists which constituted selections made by them, and with reference to which the Secretary of the Interior had delayed and neglected to act ; and they refer to the opinion of this court in *Tubbs* v. *Wilhoit*, 138 U. S. 134, 137, in which it is said :

" In consequence of the delays in certifying the lists and the inconveniences which followed, the legislatures of several States, in which such lands existed, undertook to identify the lands and dispose of them, and for that purpose passed various acts for their survey and sale and the issue of patents to purchasers. The conflicts which thus arose between parties claiming under the State and parties claiming directly from the United States led to various acts of Congress for the relief of purchasers and locators of swamp and overflowed lands. Act of March 2, 1855, 10 Stat. 634, c. 147; act of March 3, 1857, 11 Stat. 251, c. 117."

This argument is entitled to consideration because the word " selection " applies more naturally to the action of the grantee in reporting to the land department the lands which it claims, than to the action of the land officers in identifying from the field notes what are and what are not swamp and overflowed lands. The term " selection " is not an apt word to describe the identification of certain lands according to evidence presented of their character. But we need not rest on this. Conceding that the statute applies not merely to those cases in which affirmative action had been taken by the States, but also to those in which without any such action the only proceedings had been those in the land department of the United States, still we think that it cannot be held that this act is to be construed as expressing a purpose to make the list in this case, approved and certified to the State, a finality as to the lands passing under the grant and an absolute transfer of the equitable title.

In order to fully understand the matter attention must be called to the act of 1850. That granted, as has been seen, swamp and overflowed lands, and directed the Secretary of the Interior, as soon as practicable, to make an accurate list and plats of such lands and transmit the same to the Governor, and thereafter, at his request, cause a patent to be issued. The manner in which the Secretary should discharge this duty, the evidence that should be required by him as to the character of the lands, were not prescribed by the act; the matter was left to his discretion. The Secretary sent out

instructions to the surveyor general of the State of Michigan to make lists of the unsold swamp lands, as shown by the field notes on file in his office. From these instructions we quote this passage : " The only reliable data in your possession, from which these lists can be made out, are the field notes of the surveys on file in your office, and if the authorities of the State are willing to adopt these as the basis of those lists, you will so regard them ; if not, and those authorities furnish you satisfactory evidence that any lands are of the character embraced by the grant, you will so report them." On receipt of a letter containing notice of this from the surveyor general the Governor replied that he did not have authority to incur any expense in the matter, and afterwards referred it by message to the legislature, which body, by act passed June 28, 1851, Laws of Michigan, 1851, p. 322, adopted the surveys on file in the surveyor general's office as the basis of adjustment. The effect of this legislative action was not to make an erroneous survey conclusive nor to preclude the land department from the exercise of its unquestioned jurisdiction to correct surveys, but simply to accept the field notes finally approved as the evidence of the lands passing under the grant, leaving to the land department to make any needed corrections in the surveys and field notes. In other States different action was taken by the state authorities, as appears from the opinion of this court in *Tubbs* v. *Wilhoit, supra.* Now, the obvious purpose of this act of 1857 was to ratify and confirm the various steps taken by the Secretary of the Interior in the selection of swamp and overflowed lands. It was general in its terms, reaching to all the States, and the different modes by which identification of the swamp and overflowed lands had been attempted to be accomplished. It cannot fairly be construed as intending to put an end to all further inquiry in the land department, nor to oust that department of jurisdiction to inquire into and correct any frauds or mistakes, but was a general ratification and confirmation of the methods pursued. It cannot be supposed that Congress intended by this act to condone all frauds, to prevent the correction of errors or mistakes, to take every-

thing as it then appeared on the records of the land department, and, forbidding any further inquiry, declare that lands which by such records, through error or fraud, appeared to be swamp and overflowed, should be granted to the State. It was not an act to enlarge the grant of 1850. It was not an act to oust the land department of its ordinary jurisdiction to inquire into and ascertain what were swamp and overflowed lands, but was an act confirming and ratifying the methods thus far pursued. Congress must have been aware of the fact that there were charges of fraud or mistake 'in reference to the surveys in the State of Michigan. It had appropriated large sums for resurveys. They had partially been made, and mistakes, if not frauds, had been found. It does not appear that such charges existed in reference to the surveys in other States; at any rate, it is not to be presumed that all surveys in all the States were fraudulent or erroneous, and it would require very clear and direct language before the intent could be imputed to Congress to ignore the existence of alleged frauds and errors in the one State and to confirm titles to lands in that State based upon such fraudulent or erroneous surveys, and thereby enlarge, perhaps very materially, the amount of the grant to such State. The language of the act does not compel any such conclusion as to the intent of Congress.

The decision in *Martin* v. *Marks*, 97 U. S. 345, does not conflict with this construction of the act of 1857. It is true this language is found in the opinion: "After the passage of that act the land department had no right to set aside the selections." But in that case there was no question of the power of the land department to correct errors or mistakes. The plaintiff relied on a list made by the surveyor general of Louisiana of swamp and overflowed lands, which list, containing the land in dispute, had been forwarded to the general land office, and there filed. It did not appear that this list had been formally approved by the Secretary of the Interior, as contemplated by the act of 1850. The defendant relied on a patent from the United States, issued long thereafter. It was held that the act of 1857 dispensed with the formal approval by the Secretary of the Interior, and confirmed the lists made

and filed with the commissioner of the general land office. And in view of that fact, and as no question had been made in the land department of the correctness of the survey, it was adjudged that the equitable title of the State to the land was perfect. So, in this case, if there had been no challenge of the original surveys, no attempt at a resurvey or to correct errors or mistakes, and there had been simply a lack of the formal approval of the list by the Secretary of the Interior, that case would have compelled an adjudication that the full equitable title had passed to the State of Michigan, and would have invalidated the patent subsequently issued by the United States directly to the parties under whom the defendants claim. But that is far from deciding that all power in the land department to inquire into frauds or errors in the surveys was taken away and all frauds upon the Government in such surveys condoned. It was merely a decision that as the identification by the surveyor general of the land as swamp land had not been challenged for fraud or mistake, it was binding on the question of title, and the approval by the Secretary of the Interior and the issue of the patent were simply ministerial acts. See also *Blanc* v. *Lafayette*, 11 How. 104.

We see no error in the judgment of the Court of Appeals, and it is, therefore,

*Affirmed.*