### JONES v. HOOVER.

(Circuit Court, D. Oregon. February 19, 1906.)

No. 2,905.

1. PUBLIC LANDS—UNPATENTED LANDS—EQUITY JURISDICTION.

While a court of equity will not interpose to determine as to the ultimate legal title to public lands while the same abides still in the government, and the process of its acquirement by private right con-

tinues in fieri, it will at least interpose to give or maintain possession where such possession is an essential for completing purchase under the acts of Congress relating to the disposition of such lands, and to that end will review the acts of the Land Department in its construction of the law applicable to the conditions prevailing.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 341–343.]

2. SAME—SALE OF UMATILLA INDIAN LANDS—CONSTRUCTION OF STATUTES.

Act March 3, 1885, c. 319, 23 Stat. 340, relating to the Umatilla Indian reservation in Oregon, after providing for setting apart lands for allotments to the Indians, required the remainder of the lands to be surveyed, appraised, and sold at public auction, and provided that each purchaser should be entitled to purchase at such sale "160 acres of untimbered lands and an additional tract of 40 acres of timbered lands and no more," and that before patent issued for the untimbered lands he should be required to make proof that he had resided on the land purchased at least one year and had reduced at least 25 acres to cultivation. A portion of the lands not having been sold at the public sale, Act July 1, 1902, c. 1380, 32 Stat. 730, was passed authorizing their sale at private sale "in conformity with the provisions of" the prior act, "provided" that any bona fide settler on any of "said lands should have the preference right to buy the same for 90 days. Held, that the later act was supplementary to the first, and both must be construed together as a single act, and a purchaser of 160 acres of untimbered land under the first was disqualified by the limitation therein from buying under the second, although he was a settler on the tract he sought to buy; the clause following the word "provided" in said act not being a technical proviso, nor intended to except settlers from any of the limitations imposed on all purchasers.

In Equity.  On demurrer to bill.

The complainant by his bill of complaint avers and shows, in brief, that in September, 1899, he settled upon the S. W. ¼ of section 34, township 2 N., range 32 E., W. M., in Umatilla county, Or. (the same being untimbered land and within the original limits of the Umatilla Indian reservation), and established his residence thereon, with the intention of making the same his permanent home, and has since continuously resided thereon; that by virtue of an act of Congress, approved March 3, 1885 (23 Stat. 340, c. 319), entitled "An act providing for allotment of lands in severalty to the Indians residing upon the Umatilla reservation, in the state of Oregon, and granting patents therefor, and for other purposes," and an act supplementary thereto, approved June 29, 1888 (25 Stat. 239, c. 503), a sale was had of unallotted lands upon said reservation, and the complainant became the purchaser of 160 acres of untimbered land thereof, and thereafter obtained patent for the same from the general government, but that he did not purchase any timbered land; that at the said sale of said unallotted lands a large portion thereof yet remained unsold; that thereafter, and at the date of the passage and approval of the act of Congress of July 1, 1902 (32 Stat. 730, c. 1380), complainant was residing upon the land first herein described, and had thereon, of which he was the owner, certain substantial improvements, consisting of a dwelling house, etc. (fully describing the same), and thereupon, and about August 2, 1902, applied, under the provisions of said act, to purchase the same; that he made cash entry therefor, No. 352, and paid the purchase price, and at the same time applied to purchase 40 acres of timbered land, paying also the purchase price therefor; that the register and receiver of the United States Land Office at La Grande, Or., accepted the purchase price for both tracts, and issued final receipt for the payment of the same, and that complainant and his family have since continued to, and do now, reside upon and occupy the said land so purchased; that thereafter, and prior to August 5, 1903, complainant filed with the register and receiver his written notice of his intention to make proof of his said entry, on

publication of which he submitted his proofs of residence and cultivation, to the satisfaction of such officers, and that, in respect of said purchase and entry, he has done all things required by law, or by the rules and regulations of the honorable Commissioner of the General Land Office and the honorable Secretary of the Interior, to be done in the premises, by reason whereof he is the owner of the equitable title to said tracts of land, and is entitled to be protected in his possession of the same; that thereafter the defendant commenced a contest against said entry of complainant as to the land herein described, upon the ground that complainant had theretofore exercised his right to the purchase of lands upon said Umatilla reservation, and was not therefore entitled to purchase at any subsequent sale; that said contest was denied by the register and receiver, but subsequently sustained on appeal to the Commissioner of the General Land Office, and again by the Secretary of the Interior; that in pursuance of the ruling of such latter officers the register and receiver have since issued to the defendant a receipt for the final payment for the purchase price of said land. Wherefore he now claims to be the owner thereof, and entitled to possession, and threatens to forcibly eject complainant therefrom, and, unless restrained, will attempt to possess himself of both the land and complainant's improvements, to the latter's irreparable injury, and that complainant is without any plain, speedy, or adequate remedy at law. The prayer is that defendant be enjoined from entering or taking possession of said land, or in any way interfering with complainant's possession until the final determination of the cause; that on final hearing the complainant be decreed to be the owner in fee simple of the land in dispute, and to have complied with all the provisions of the act of Congress of July 1, 1902 (32 Stat. 730, c. 1380), entitling him to a patent; and that it be further decreed that any patent issued to the defendant, or any title acquired by him, shall inure to, and be held in trust for the use and benefit of, complainant. To this complaint the defendant has demurred, on the grounds, first, that the court is without jurisdiction of the subject-matter; and, second, that the complaint does not state facts entitling complainant to the relief demanded.

James H. Raley, John J. Balleray, and John McCourt, for complainant.

L. B. Reeder, for defendant.

WOLVERTON, District Judge (after stating the facts as above). Counsel for defendant makes two contentions in support of the demurrer: First, that, the legal title to the premises never having passed out of the general government, the jurisdiction for determining who is entitled thereto remains exclusively with the Land Department, and that, until patent issues, a court of equity will not interpose to control the rights of the parties litigant—in other words, that a court of equity is without authority in the premises until the government has first divested itself of jurisdiction by absolute grant or the issuance of its patent—and, second, that under a proper interpretation of the acts of Congress of March 3, 1885, and July 1, 1902, complainant was not qualified to purchase the land in dispute, and therefore is not entitled to relief. It has been many times held by the Supreme Court of the United States that, while the legal title to public lands yet remains in the general government, the Land Department has absolute jurisdiction to determine with reference thereto, and to award it to whomsoever may seem, under the rules governing the sale and disposition of such lands, to be entitled thereto, and that until patent issues equity will not ordinarily assume jurisdiction to control the rights of parties contestant. The doctrine of

Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485, has become the doctrine of all the cases since. Towsley had a patent certificate from the government, and Johnson a patent absolute. The case was in equity, and the question whether Johnson had not received the title that should have been given Towsley. The court, speaking through Mr. Justice Miller, said, among other things:

"This court has at all times been careful to guard itself against an invasion of the functions confided by law to other departments of the government, and in reference to the proceedings before the officers intrusted with the charge of selling the public lands it has frequently and firmly refused to interfere with them in the discharge of their duties, either by mandamus or injunction, so long as the title remained in the United States and the matter was rightfully before those officers for decision. On the other hand, it has constantly asserted the right of the proper courts to inquire, after the title had passed from the government, and the question became one of private right, whether, according to the established rules of equity and the acts of Congress concerning the public lands, the party holding that title should hold absolutely as his own, or as trustee for another."

Following this is Warren v. Van Brunt, 19 Wall. 646, 22 L. Ed. 219, wherein title had passed out of the government by patent. The court reiterated its doctrine, quoting the latter part of the above paragraph. The next is Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424, also a case where the patent had issued. The court says:

"The officers of the Land Department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption. If they err in the construction of the law applicable to any case, or if fraud is practiced upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions."

By reference back to Johnson v. Towsley, it will be seen that by the use of the words "private parties" is probably meant such parties as have acquired the legal title and hold by "private right." Passing the case of Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848, to which I will recur later on, the next following is Marquez v. Frisbie, 101 U. S. 473, 474, 25 L. Ed. 800. This was originally instituted by petition in the state court, setting forth several reasons why the decision of the Department of the Interior against plaintiff's claim as a pre-emptor, and in favor of others, was erroneous, and praying a decree of the court declaring him to be the true owner and his right to the legal title paramount. The patent here had not issued. The court, again speaking through Mr. Justice Miller, says:

"It plainly appears from this [referring to an allegation in the petition], first, that defendants had not the legal title; second, that it was in the United States; and, third, that the matter was still in fieri, and under the control of the land officers."

And later, in declaring the law applicable, it continues:

"We have repeatedly held that the courts will not interfere with the officers of the government while in the discharge of their duties in disposing of the public lands, either by injunction or mandamus. * * * After the United States has parted with its title, and the individual has become vested with it, the equities subject to which he holds it may be enforced, but not before"—citing Johnson v. Towsley and Shepley v. Cowan, supra.

Again, in United States v. Schurz, 102 U. S. 378, 396, 26 L. Ed. 167, that being a mandamus proceeding to require the Secretary of the Interior to deliver a patent, the court says:

"This court has with a strong hand upheld the doctrine that so long as the legal title to these lands remained in the United States, and the proceedings for acquiring it were as yet in fieri, the courts would not interfere to control the exercise of the power thus vested in that tribunal. To that doctrine we still adhere."

So in Michigan Land & Lumber Company v. Rust, 168 U. S. 589, 592, 593, 18 Sup. Ct. 208, 209 (42 L. Ed. 591):

"Generally speaking, while the legal title remains in the United States, the grant is in process of administration, and the land is subject to the jurisdiction of the Land Department of the government. * * * In other words, the power of the department to inquire into the extent and validity of the rights claimed against the government does not cease until the legal title has passed."

The power of the department, it must be conceded, to exercise its jurisdiction to determine whether an equitable title has passed might at times, depend on notice to interested parties, but this only reinforces the general doctrine that its jurisdiction continues until the ultimate title has passed from the government. Again, in Brown v. Hitchcock, 173 U. S. 473, 19 Sup. Ct. 485, 43 L. Ed. 772, which was also a mandamus proceeding, after repeating the above quotation from United States v. Schurz, the court further says:

"We do not mean to say that cases may not arise in which a party is justified in coming into the courts of the district to assert his rights as against a proceeding in the Land Department or when the department refuses to act at all. * * * But what we do affirm and reiterate is that power is vested in the departments to determine all questions of equitable right or title, upon proper notice to the parties interested, and that the courts must, as a general rule, be resorted to only when the legal title has passed from the government. When it has so passed, the litigation will proceed, as it generally ought to proceed, in the locality where the property is situate, and not here, where the administrative functions of the government are carried on."

Thus it will be seen that, by an unbroken line of cases in the Supreme Court of the United States, the doctrine has been firmly established that while the title remains in the government and is yet in process of acquirement by the purchaser—in other words, while it is "in process of administration" (to use the expression of Mr. Justice Brewer in Michigan Land & Lumber Co. v. Rust, supra) by the department—the courts are wholly without jurisdiction to determine as it respects the ultimate title and to declare its ownership in private right. But, notwithstanding such doctrine, the Supreme Court has entertained jurisdiction to declare the equitable rights of parties in different stages in the process of acquirement of the legal title to public land. Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848, is a case of that nature. Moore and Davis were defendants in the suit; each claiming title to a distinct tract or parcel of land as against plaintiff Robbins. Patent had issued to Moore, but Davis had in support of his claim the final decision only of the Land Department that he was entitled to patent. Jurisdiction was clear as to the Moore

tract; not so as it related to Davis. But in the retention and exercise of jurisdiction, the case having gone up from the Supreme Court of Illinois, the court said:

"It is not denied, however, that to one or the other of the parties now before the court this title equitably belongs, and it is the purpose of the present suit to decide that question."

And, further, having reference to the decision of the Land Department:

"And, though no patent has been issued, that decision remains the authoritative judgment of the department as to who has the equitable right to the land."

So it was that the court did adjudicate with reference to the pending equitable title, notwithstanding that patent had not then issued; and, in doing so, it must be conceded it determined with respect to the legality of the act of the Land Department in making its final decision as to who was entitled to patent. So in Orchard v. Alexander, 157 U. S. 372, 15 Sup. Ct. 635, 39 L. Ed. 737, a case in ejectment instituted in the superior court of the state of Washington, where the final receipt of the register and receiver, issued in the course of obtaining title through pre-emption, was sufficient upon which to maintain an action for possession. An equitable defense was interposed, whereby it was shown that the final receipt upon which plaintiff relied to maintain his possession had been annulled by the Land Department, and that thereupon a patent certificate had issued to the defendant in the action. Upon the reply made by plaintiff the question was presented whether the Commissioner of the Land Department or the Secretary of the Interior was vested with jurisdiction to review the action of the register and receiver in their determination as respects the matter of settlement and improvement; it being claimed by plaintiff that his final certificate was evidentiary of a final adjudication in a quasi judicial way, and not subject to annulment by any other authority. Jurisdiction was maintained in the state court to try out this question, and upon a writ of error to the Supreme Court of the United States the case was resolved adversely to the plaintiff, by a holding which involved an examination and approval of the action of the Land Department annulling plaintiff's final certificate; thus defeating plaintiff in his possessory action. So that the court did here in fact entertain cognizance to review the action of the Land Department while the legal title yet remained in the government; but it was for the purpose of determining a possessory right, not an ultimate right to the legal title. In this connection, I may appropriately recall some further utterances of the court in Marquez v. Frisbie, supra. After declaring what the court had previously held, it explained:

"We did not deny the right of the courts to deal with the possession of the land prior to the issue of the patent, or to enforce contracts between the parties concerning the land, but it is impossible thus to transfer title which is yet in the United States."

Then, as a reason for determining the controversy on the pleadings, the court says:

"But, if it can be made entirely plain to a court of equity that on facts about which there is no dispute, or no reasonable doubt, those officers have, by a mistake of the law, deprived a man of his right, it will give relief. Looking to the complaint in this case, no such clear statement of a mistake of law is to be found."

Thus indicating that, notwithstanding the very positive rule laid down in that case that while the matter was in fieri, and the legal title had not yet passed from the United States, the courts could not assume to adjudicate touching the ultimate legal title, yet that, if there was a clear right of which a person was being deprived through a mistake of the law, equity would interpose to relieve the situation. In consonance with the case of Moore v. Robbins, the Supreme Court of Minnesota, in McHenry v. Nygaard, 72 Minn. 2, 74 N. W. 1106, entertained jurisdiction in equity to determine a controversy while yet the United States held the bare legal title; it being conceded that the equitable title was either in the plaintiff or the defendant.

In Oregon it has been held that a party who has made entry upon the public lands under the homestead and pre-emption acts, and has taken the initial steps toward acquiring title from the government, is in a position to invoke equitable relief by way of putting him in possession, where kept out by another, that he might complete his residence and cultivation, and perform such other acts as are required by law, looking to his obtaining the ultimate title through his purchase from the general government. Kitcherside v. Myers, 10 Or. 21; Jackson v. Jackson, 17 Or. 110, 19 Pac. 847.

In a still later case (Moore v. Halliday, 43 Or. 243, 72 Pac. 801, 99 Am. St. Rep. 724) the doctrine is adhered to; the court remarking that, "in each of these cases, however [citing the above with others], the equitable intervention was based upon the defendant's interference with the plaintiff's right to possession"; but the plaintiff was denied the right he demanded, which was that his equitable title be quieted as against an alleged equitable title of defendant, where possession was not disturbed or threatened.

If a court of equity will interpose to give possession where the rightful claimant is out, but entitled thereto, to enable him to comply with the requirements of the law so that he may prove his claim, it will surely, with equal authority, restrain a trespass where such trespass will prevent the rightful claimant from doing like acts necessary to the acquirement of his title. I think I am safe in deducing this principle from the foregoing authorities: That, while a court of equity will not interpose to determine as to the ultimate legal title to public lands while the same abides still in the government and the process of its acquirement by private right continues in fieri, it will at least interpose to give or maintain possession where such possession is an essential for completing purchase under the acts of Congress relating to the disposition of such lands, and to that end will review the acts of the Land Department in its construction of the law applicable to the conditions prevailing.

Applying these rules to the present case, it is manifest that the suit is not maintainable to determine the respective rights of the parties as it regards the legal or ultimate title to the land in dis-

pute, for it is still in process of administration by the Land Department. The prayer of the bill of complaint would seem to contemplate this relief, and none other. But, as the greater always includes the less, I am disposed to consider the bill as one to restrain the defendant from gaining possession of the premises, and thus interfering with the plaintiff in doing those acts necessary and requisite under the law to the acquirement of the ultimate or legal title. This requires a construction of the acts of Congress of March 3, 1885, June 29, 1888, and July 1, 1902, to determine their meaning and purpose.

The act of March 3, 1885 (23 Stat. 340, c. 319), by its first section required the appointment of a commission, whose duty it was to go upon the reservation and determine the amount of land requisite to make the designated allotments to the Indians, and to set apart for that purpose, together with 640 acres for an industrial farm and school, all in a compact form, not exceeding in the aggregate 120,000 acres. By its second section it provided:

"That as soon as the report of said commission in respect to the new boundaries of said reservation shall be approved, the residue of said reservation lands not included in said new lines shall be surveyed, if not already surveyed, or if the stakes and monuments, if surveyed, have become so obliterated that the lines cannot be ascertained, and the same shall be appraised and classified into timbered and untimbered lands; and in case where improvements have been made by any Indian or for the United States upon such lands, such improvements shall be separately appraised, and if the same belong to an Indian, such Indian shall be reimbursed the value of such improvements, in money; but no lands shall be appraised at less than one dollar and twenty-five cents per acre. The said lands, when surveyed and appraised, shall be sold at the proper land office of the United States, by the register thereof, at public sale, to the highest bidder, at a price not less than the appraised value thereof, such sale to be advertised in such manner as the Secretary of the Interior shall direct. Each purchaser of any of said lands at such sale shall be entitled to purchase one hundred and sixty acres of untimbered lands and an additional tract of forty acres of timbered lands, and no more. He shall pay one-third of the purchase-price of untimbered lands at the time of purchase, one-third in one year, and one-third in two years, with interest on the deferred payments at the rate of five per centum per annum, and shall pay the full purchase-price of timbered lands at the time of purchase. And where there are improvements upon the lands purchased which shall have been separately appraised, the purchaser shall pay the appraised value of such improvements at the time of purchase, in addition to the amounts hereinbefore required to be paid. Each purchaser shall, at the time of making his purchase, make and subscribe an oath or affirmation that he is purchasing said lands for his own use and occupation, and not for or on account of or at the solicitation of any other, and that he has made no contract whereby the title thereto shall, directly or indirectly, inure to the benefit of another. And if any conveyance is made of the lands set apart and allotted as herein provided, or any contract made touching the same, or any lien thereon created before the issuing of the patent herein provided, such conveyance, contract, or lien shall be absolutely null and void. And before a patent shall issue for untimbered lands the purchaser shall make satisfactory proof that he has resided upon the lands purchased at least one year and has reduced at least twenty-five acres to cultivation. No patent shall issue until all payment shall have been made; and on the failure of any purchaser to make any payment when the same becomes due, the Secretary of the Interior shall cause said land to be again offered at public or private sale, after notice to the delinquent; and if said land shall sell for more than the balance due thereon, the surplus, after deducting expenses, shall be paid over to the first purchaser."

The purpose of the act of June 29, 1888 (25 Stat. 239, c. 503), was to permit the sale to be made upon the reservation.

The act of July 1, 1902 (32 Stat. 730, c. 1380), is entitled "An act to provide for the sale of the unsold portion of the Umatilla Indian reservation," and provides:

"That all the lands of the Umatilla Indian reservation not included within the new boundaries of the reservation and not allotted or required for allotment to the Indians, and which were not sold at the public sale of said lands heretofore held at the price for which they had been appraised, and upon the conditions provided in an act entitled 'An act providing for allotment of lands in severalty to the Indians residing upon the Umatilla reservation, in the state of Oregon, granting patents therefor, and for other purposes,' shall be sold at private sale by the register of the land office in the district within which they are situated at not less than the appraised value thereof, and in conformity with the provisions of said act: Provided, that any bona fide settler upon any of said lands who is the owner of substantial improvements thereon, and who has so settled and improved any subdivision of said lands, with the intent of permanently residing on the same as a homestead, shall have a preference right to buy the lands so settled upon by him at any time within ninety days after the passage of this act, upon making satisfactory proof in the local land office as to settlement, intent, and improvements."

The question of construction to be determined is whether a purchaser of 160 acres of untimbered land, under the act of 1885, is disqualified to purchase a like quantity and quality of land under the act of 1902. In a nutshell, the act of 1902 provides that the unallotted lands remaining undisposed of shall be sold at private sale, at not less than the appraised value, in conformity with the provisions of the act of 1885. This is followed by the further provision in favor of bona fide settlers.

It is practically conceded that all of the provisions of the act of 1885 should be read into and become a part of the act of 1902, in so far as they regulate the amount of land that any one purchaser is entitled to buy, the payment to be made for appraised improvements, and the payment to the government of the purchase price; and require of the purchaser an oath or affirmation that he is purchasing for his own use and benefit, and that he has made no contract whereby the title shall inure to the benefit of another. And it will not be controverted that such provisions should also be read into the act of 1902, whereby the purchaser is required before patent issues for untimbered lands to make satisfactory proof of residence for at least one year, and that he has reduced 25 acres of his purchase to cultivation, and to pay the entire purchase price, as well as the provision relating to a resale in case the purchase is not completed. So it is that practically all the provisions of the act of 1885 are to be read into and become a part of the act of 1902, save the requirement that the lands shall be disposed of at public sale; the latter act especially providing for their disposition at private sale.

The real contention of counsel for plaintiff, therefore, is that the act of 1902 provides for a disposition of the unsold lands on the Umatilla reservation, outside of the diminished reserve, the same in effect as if no previous sale had ever taken place, giving to any person the right to purchase at such sale, and this notwithstanding he

had acquired 160 acres of untimbered land at the former sale. In other words, that the latter act provides for a sale of such lands entirely independent of the former, so that the purchaser is not restricted in any manner by any previous purchase he may have made.

This contention is supplemented by another, most strenuously urged, namely, that the provision in favor of settlers should be treated as a proviso, giving it the force and effect of such a clause in its technical sense, and that the act should be interpreted accordingly. The first contention is based upon the wording of the clause in the act of 1885, namely, "Each purchaser of any of said lands at such sale shall be entitled to purchase 160 acres," etc., "and no more," placing stress upon the words "at such sale"; the idea being that it constituted a limitation to be applied to sales made in pursuance of that act at public auction, and to none other, and that, when the language is read into the more recent act, it has reference to the private sale; or such a one as is thereby authorized to be made, and could have no relation to any previous sale, thus treating the two statutes as entirely independent one of the other, providing for the sale of distinct lands, as if the two acts had no relation in any particular.

The manifest purpose of the act of 1885, besides making allotments to the Indians, was to dispose of the remainder of the reservation lands for their benefit. Acting in pursuance of that purpose, Congress provided for the sale of the unallotted lands, adopting the policy generally applicable to the sale of public lands to homeseekers—of limiting the purchase to a specified amount. In this connection, it may be questioned whether it did not inhibit all pre-emptioners and homesteaders from purchasing at such sale, except such as had acquired fractional subdivisions adjacent to the boundaries of the reservation, on the ground that these latter were especially qualified to purchase sufficient of the reservation lands, under certain restrictions, to fill out their complement of 160 acres. See subsequent clause of section 2 of the act of 1885. But, be that as it may, Congress purposed disposing of all the unallotted lands, and the limitation as to the amount of individual purchases applied alike to all.

Now, when it was ascertained that all could not be disposed of at public sale, Congress, in furtherance of its purpose, gave authority for disposing of the remainder at private sale in conformity with the provisions formerly made therefor; thus intending, no doubt, to supplement its former legislation so that its full purpose might be accomplished. The act of 1902 must be treated, therefore, as additional legislation to accomplish the primary purpose of Congress in disposing of these unallotted lands. So treated, it becomes supplementary to the original act, and both must be construed as one, for the accomplishment of a single purpose. In this light there can be but one interpretation, which is that the limitation extends alike to both acts, and relates to all the unallotted lands of the reservation, whether sold at the first sale, or at private sale, as authorized by the later act. This is not a case of adopting another statute by general reference, but of making additional provision for accomplishing the

same purpose, and the two acts must be read as a whole, or, I might say, in pari materia, to determine what the rights and limitations of the purchaser are. The utility of the act of 1885 may be said to have run its course; but it was revived with all its force, and with all its limitations, by the act of 1902, saving only that the continuation of the disposition of such lands should be at private sale, instead of public, and that bona fide settlers should have the prescribed preference. In other words, the later act enabled the government to sell under the old at private sale. Such is the plain and manifest intendment of Congress, and I know of no rule of interpretation that would give the statutes any different signification.

Now, as to the contention that the clause relating to "Any settler," etc., is a technical proviso and creates an exception: If I am correct in the interpretation of the two acts that the latter is merely supplementary to the former, with a view to enabling the government to proceed with the sale of such unallotted lands, and the two were designed to operate in pari materia as one act, then the so-called proviso should also be read into the act of 1885, and it would stand as if no purchases had formerly been made by any one, and the designated preference would be clear and without ambiguity. But it is said that Congress must have been apprised of the condition that settlers had gone upon portions of these lands since the attempted disposition of them at public sale, and that the provision was made for their special benefit, without reference to any previous purchases; the especial purpose being to dispose of the unsold lands, in any emergency, for the benefit of the Indians. It is true, no doubt, that Congress did legislate with reference to the condition that settlers had subsequently gone upon these lands, but it does not follow that in supplementing the previous legislation it intended to prefer settlers who were also purchasers at the previous sale. The intendment of the original act was, without question, that one purchaser should acquire of these unallotted reservation lands no more than 160 acres of untimbered land. Now, there is no apparent purpose in the later act to change that policy, and, being merely supplementary to the first, I must assume that it did not so intend; otherwise, that it would have made it plain that purchasers who had again become settlers should be preferred also. The policy of the government, in the first instance, was to sell to persons desirous of obtaining land for occupancy 160 acres only, and I see no purpose of changing that policy by the so-called proviso ingrafted upon the later act, so as to give such an occupant, by reason of having become in the meantime a settler for the purpose of acquiring a homestead, an additional 160 acres of the same quality of land. The policy to sell to one person 160 acres only remains the same, and it pervades both the old and the new act to carry out but one purpose. It may be well doubted whether the word "provided" has made of the clause following a technical proviso. It is said by Mr. Justice Story, in Minis v. United States, 15 Pet. 423, 445, 10 L. Ed. 791:

"The office of a proviso, generally, is either to except something from the enacting clause, or to qualify or restrain its generality, or to exclude

some possible ground of misinterpretation of it, as extending to cases not intended by the Legislature to be brought within its purview."

The enacting clause in the act of 1902 relates to the disposition of the unallotted lands remaining unsold of the Umatilla reservation. The clause touching the preference to be given settlers might just as well have been appended without the use of the word "provided" or might have been made a subsequent section in the act. The enacting clause disposes to all persons desiring to buy. The supposed proviso prefers the settlers, if they apply to purchase within 90 days. The latter excepts nothing from the enacting clause. It possibly might be said to qualify or restrain its generality, and perhaps does, in a restricted sense; yet it is manifestly not such an exception as comes within the technical rule which allows the "particular intent" to "control the general intent of the enactment." "It does not necessarily follow," says Mr. Chief Justice Brickell, in Carroll v. State, 58 Ala. 396, 401, "because the term 'provided' is used, that which may succeed it is a 'proviso,' though that is the form in which an exception is generally made to, or a restraint or qualification imposed on the enacting clause. It is the matter of the succeeding words, and not the form, which determines whether it is or not a technical proviso." So in effect say the learned authors of the American and English Encyclopedia of Law (volume 23 [2d Ed.] p. 292):

"The words 'proviso' and 'provided' are apt words to create a condition. But, though their usual, this is not their invariable, effect; and they may be shown by the context to express simply a covenant or limitation."

Recurring to the act of 1902, the enacting clause, construed in connection with the act of 1885, provides in effect that the unsold lands of the reservation shall be disposed of at private sale, in quantities not greater than 160 acres to any one purchaser, and it might just as well have read, comprising the alleged proviso, "but that bona fide settlers," etc., "making application within ninety days, shall have a preference right to purchase." Or, as above observed, the latter clause might as well have been adopted by a succeeding section, and there was no especial reason for employing the word "provided" in the context; so that the technical construction claimed for the ·supposed proviso by counsel is inapplicable, construing the two statutes as one, and the whole according to its context and the manifest purpose of Congress in disposing of such lands to purchasers for occupation and homestead. Such is the construction given to the acts by the Land Department (Davis v. Nelson, 33 Land Dec. Dep. Int. 119), and such its ruling made with reference to the land in dispute (Hoover v. Jones, 33 Land Dec. Dep. Int. 353), and such I believe to be the reasonable intendment of Congress.

It follows, therefore, that the bill of complaint does not state facts entitling the plaintiff to any relief, even for maintaining possession pending the issuance of the patent.

The demurrer will accordingly be sustained.